UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA; MIJENTE SUPPORT COMMITTEE; JUST FUTURES LAW; and IMMIGRANT DEFENSE PROJECT,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS AND BORDER PROTECTION; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | Case No. 4:21-cv-02632-DMR<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>**Case Management Conference Date: October 20, 2021**<br><br>**Time: 1:30 P.M.**<br><br>Hon. Donna M. Ryu |

The parties jointly submit this updated Joint Case Management Conference ("CMC") Statement pursuant to Civil Local Rule 16-9, the Standing Order for All Judges of the Northern District of California- Contents of Joint Case Management Statement; this Court's Civil Conference Minute Order dated July 21, 2021 requiring the parties to provide an updated Joint CMC Statement by August 25, 2021 including a "detailed joint proposal on a schedule for search, review and production or separate proposals if no agreement can be made," ECF No. 26; and this Court's Stipulated Order dated September 23, 2021 continuing the parties' further CMC until October 20, 2021 and requiring the parties to submit an updated joint CMC statement by October 13, 2021.  ECF No. 30.

## I. Factual Background

This action was brought by American Civil Liberties Union of Northern California, Mijente Support Committee, Just Futures Law, and Immigrant Defense Project (together, "Plaintiffs"), pursuant to the Freedom of Information Act ("FOIA"). Plaintiffs submitted a FOIA request (the "Request") on October 19, 2020 to the U.S. Immigration and Customs Enforcement ("ICE"), the U.S. Customs and Border Protection ("CBP"), and the U.S. Department of Homeland Security ("DHS") (together, "Defendants") seeking the release of records related to the use of facial recognition surveillance technology to identify, locate, and track individuals. Plaintiffs filed this action on April 13, 2021, at which time Defendants had not yet released records responsive to the Request. Defendants filed their Answer on May 19, 2021.  Defendants have been working to respond to the Request, which contains more than nineteen subparts, as further described below.

## II. Status of FOIA Production

A. Plaintiffs' Statement on Status of FOIA Production: Plaintiffs have received multiple productions from each of the Defendants in this action: ICE, CBP, and DHS, as described in further detail below. Plaintiffs and Defendants have met-and-conferred several times by email and telephone to address several issues, including the manner in which Defendants have released and will release records; the manner in which Defendants identify and determine whether to release duplicate records; whether Defendants can prioritize the production of records

held by certain subcomponents of the agencies; and how Defendants have engaged in a search calculated to yield records responsive to the Request.

Plaintiffs seek the Court's intervention on two remaining issues: (1) given that ICE has identified a final page count of over 12,000 potentially responsive pages, and that ICE has chosen to forego the burden of releasing duplicate pages within each monthly production, ICE should be ordered to review 1,000 pages of potentially responsive pages each month; and (2) that when each Defendant fully withholds the release of responsive pages on the basis that those pages are duplicates of pages that have already been released, that the Defendant should be ordered to provide the Bates number of the released pages that correspond to the pages that are withheld as duplicates. The need for these orders is described below.

1. ICE: ICE has identified a final page count of over 12,000 potentially responsive pages. To date, ICE has been *reviewing* approximately 500 pages per month, but *producing* only 176 to 189 pages per month. At this rate, the agency will not conclude its response to the Request until August 2023, nearly *three* years after the Request was filed in October 2020.

Plaintiffs request that ICE be ordered to *review* 1000 pages per month so that records regarding the agency's use of facial recognition technology—a issue of critical public importance as Congress and members of the public assess whether to fund and investigate ICE's use of mass surveillance—is released while the information contained in those records remains timely and relevant. A review rate of 1000 pages per month is warranted for two main reasons.

*First*, ICE has chosen a method of review that saves it dozens of hours each month; those hours should be applied towards the review of additional pages. Specifically, while ICE has reviewed approximately 500 pages per month, it releases a much smaller number and withholds over half by asserting that they are duplicates of pages already produced. In its First Interim Production dated August 16, 2021, ICE processed 511 pages; released only 189 pages; and withheld 292 pages as duplicates (almost 60% of the reviewed pages). In its Second Interim Production dated September 16, 2021, ICE processed 515 pages; released only 176 pages; and withheld 265 pages as duplicates (over 50% of the reviewed pages). ICE has asserted that the production of duplicate pages would be burdensome and inefficient because it would be required

to apply duplicate redactions to hundreds of pages. Since ICE saves significant time each month by foregoing the redaction and release of hundreds of duplicate pages, it should be required to use that time in order to review an additional number of pages each month.

*Second*, a review rate of 1000 pages per month accords with court orders in other FOIA cases, and even the agency's own practice. *See Am. Civil Liberties Union of N. Cal. v. U.S. Imm. and Customs Enforcement*, Case No. 3:18-cv-04105-LB, ECF. No 47 Minute Order, Sept. 27, 2019 (ordering ordering ICE to *produce* 750 pages per month); Ex. A (ICE letter of October 1, 2019 referencing *review* and *production* of over 500 pages that month in Case No. 3:18-cv-04105 (N.D. Cal.).

Finally, Plaintiffs request that ICE, along with CBP and DHS, be ordered to identify the Bates numbers of released pages that correspond to the pages withheld as duplicates. As a threshold manner, ICE has an obligation to make an accurate assessment that records are true duplicates. For many types of records, this determination may not be straightforward because there are slight differences among pages that appear identical, but are not: for example, an email or memorandum may be forwarded to a recipient in one thread, but to a different recipient in a different thread. Receipt by the different individuals can be critical to assessing a public official's awareness of key information on a particular date. Without technology to ascertain that the pages are true duplicates, the agencies appear to be relying on manual review of hundreds of pages to assess and assert that they are duplicates. That manual review, which could be done by different reviewers across monthly productions, raises serious concerns about whether the duplicate nature is assessed the same way and whether reviewers are aware of what documents have been previously produced. While the agencies state that the assessment of duplicates is done only by a single reviewer within that month's production of documents, Plaintiffs remain concerned that the agency may not be making the correct assessment of duplicates since over 50% of the reviewed pages are being withheld by ICE as duplicates. Therefore, Plaintiffs request that, when the agencies withhold pages as duplicates, they identify the Bates range of released pages that correspond to the withheld pages. This practice would allow Plaintiffs to understand which types of records are being withheld as duplicates, and whether there are any concerns with

significant number of pages being withheld.

2. <u>CBP</u>: Plaintiffs received CBP's first interim production dated August 16, 2021 and second interim production dated August 24, 2021, in which CBP reviewed 49 pages; referred 7 pages to other agencies for review; withheld 42 pages as duplicates of the 7 pages referred to other agencies for review; and ultimately determined that the 7 pages would be withheld in full. CBP's third interim production dated September 16, 2021 released 27 pages in part.

3. <u>DHS</u>: Plaintiffs have received two productions from the DHS Office of Civil Rights and Civil Liberties, one dated August 16, 2021 and one dated September 16, 2021, in which 499 pages were reviewed and just 158 pages released in whole or in part. 8 pages were not released on the basis that they were "duplicates," but no information was provided as to what these pages were duplicates of. The DHS Office of Privacy made a production on September 16, 2021, in which 107 pages were reviewed and 37 pages were released in whole or in part.

B. Defendants' Statement on Status of FOIA Production:

As Defendants previously reported to the Court, Defendants share Plaintiffs' interest in setting a production schedule for responsive, non-exempt records, and have been working to determine the scope of potential records. ECF No. 25 ¶ 17. However, given the breadth of the Request and the number of agencies, components and offices involved, Defendants needed additional time to determine the scope of potentially responsive records and meet and confer with Plaintiffs regarding the Request and a reasonable production schedule for responsive, non-exempt records. In the interim, Defendants committed to begin producing responsive, non-exempt records to Plaintiffs on a rolling basis in monthly interim releases, including responsive, non-exempt records within the pages ICE, DHS, and CBP identified through the date of the initial CMC. *Id.*

1. <u>ICE</u>: In the parties' prior CMC statement on August 25, 2021, ECF No. 27, Defendants reported that since the date of the parties' initial CMC, ICE had completed the process of searching the records of the Office of Policy ("Policy"), Homeland Security Investigations ("HSI"), Enforcement and Removal Operations ("ERO"), Office of the Principal Legal Advisor ("OPLA"), Information Governance and Privacy ("IGP"), and Office of

Acquisitions ("OAQ").  ICE also determined a final page count of potentially responsive records of approximately 12,544 pages.  ICE processed 511 pages and produced 189 pages to Plaintiffs on August 16, 2021.  Of the remaining pages, 5 pages were withheld in full pursuant to Exemptions 5, 6, 7(C) or 7(E), 3 pages required submitter's notices with an outside organization, 17 pages were referred to the Government Accountability Office ("GAO"), CBP, and DHS, and 302 pages were deemed duplicate and/or non-responsive.  Defendants further reported that given the FOIA office's staff levels and workload, ICE calculated that it would be able to process a minimum of 500 pages per month and release non-exempt responsive records to Plaintiffs on the 16th of each month.  Defendants also reported that ICE would process the 3 pages that required submitter's notices with an outside organization by September 16, 2021 if, as ICE anticipated, the outside organization responded by the requested date of August 27, 2021.  *Id.*

Since the date of the parties' prior CMC statement, ICE has continued to process a minimum of 500 pages per month.  The parties also continued to meet and confer, including on several topics Plaintiffs identified in the parties' prior CMC statement.  *See id.* at 3:16-19 ("whether ICE can (1) specify how many pages have been identified by each subcomponent of ICE; (2) whether ICE can prioritize the review and production of pages identified by certain subcomponents; and/or (3) the search terms used by the agency to identify potentially responsive records.").  ICE was unable to break down the approximately 12,544 pages it identified by subcomponent given how the documents were uploaded.  However, ICE was able and willing to prioritize the review of records from the one office Plaintiffs specifically requested – OAQ – in an effort to reach agreement on ICE's proposed processing rate of 500 pages per month.

Defendants also provided Plaintiffs with more detail about the search terms ICE used to identify potentially responsive records, to address Plaintiffs' concern that ICE's search terms may have pulled in nonresponsive information within the approximately 12,544 pages it identified.  Defendants explained to Plaintiffs that ICE identified and searched the records of 24 custodians.  ICE searched Outlook mailboxes, shared drives, hard drives, and/or file cabinets, depending on the custodian.  ICE's searches involved the following terms, with different combinations used depending on the custodian: Clearview AI, Clearview Contract, Facial

Recognition, Recognition, AWS, Clearview, Clearview AI Policy, Clearview Policy, Clearview numbers, help@clearview.ai, PTA, PIA, 70CMSD20P00000130, Broadcast, Facial, FR, Artificial intelligence, @clearview.ai, and the names of Clearview AI employees.  Defendants believe ICE's selection and use of these search terms was reasonably calculated to uncover all relevant documents.

Defendants also addressed additional questions Plaintiffs raised about the number of duplicate pages ICE identified in its productions, as well as ICE's approach to identifying duplicates.  As a courtesy, Defendants explained that ICE identified 292 pages of duplicates in connection with its August 16, 2021 production, and 265 pages of duplicates in connection with its September 17, 2021 production.  Defendants also explained that ICE (and DHS and CBP) only consider identical documents to be duplicates.  If a document has a different date, email recipient, or any other content, it would not be considered a duplicate.  ICE (and DHS and CBP) identified duplicates by comparing documents side-by-side during the review.  Further, with respect to a specific question from Plaintiffs about how ICE's FOIA office determines if a document is a duplicate of a document that was reviewed in an earlier 500-page batch of the approximately 12,544 pages ICE identified, Defendants explained that an ICE FOIA processor would only identify duplicates of documents that he or she reviewed within the same batch.  In other words, the processor would only be de-duping pages that are identical to other pages that the processor himself or herself reviewed within the current batch of approximately 500 pages.  By limiting de-duping to documents reviewed by the same processor and in the same batch, ICE sought to alleviate Plaintiffs' concerns about prospective human errors in de-duplication and err on the side of producing material to Plaintiffs.

Defendants note that Plaintiffs have requested that ICE go further and identify the Bates-ranges of all pages it withholds as duplicates.  Defendants have explained to Plaintiffs that this is not possible due to the way in which records are reviewed and then exported for Bates-stamping.  Defendants also believe this approach is not necessary at this time in the absence of any indication that Defendants have incorrectly de-deduped any pages in this case.  Instead, Defendants believe that ICE's approach — of limiting de-duping to identical documents

identified by the same FOIA processor within the same batch — should address Plaintiffs' prospective concerns.

As Plaintiffs note above, Plaintiffs have asked Defendants to increase ICE's processing rate to 1000 pages per month.  ICE assessed Plaintiffs' request in good faith and has explained to Plaintiffs that it can increase its processing rate to 750 pages per month if Plaintiffs would agree with ICE's approach to de-duping, above (*i.e.*, agree that ICE would not need to spend the time and resources to further identify pages from its production that correspond to documents withheld as duplicates, given the absence of any such errors in this case and Defendants' lack of any legal obligation to identify duplicates).  Finally, Defendants note that in its experience, parties have stipulated to — and courts have approved — reasonable *processing* (*i.e.*, review) rates, even where the documents involved far less complex exemptions than those at issue in this case, and especially where – as here – an agency's FOIA workload is immense.  *See, e.g.*, *Swords to Plowshares v. U.S. Dep't of Veterans Affairs*, No. 3:20-cv-07146-JSC, ECF No. 31 (March 19, 2021) (setting *review* rate of 600 pages per month); *USRTK v. U.S. Dep't of Education*, No. 20-cv-09117-DMR (setting *review* rate of 750 pages per month).  Agencies can commit to *processing* a number of pages — as opposed to *releasing* a certain number — because some of the processed pages will be nonresponsive or exempt from disclosure, and agencies therefore cannot reliably predict the number of pages they will be able to release in a given month.  Defendants note further that ICE's proposed processing rate of either 500 or 750 pages per month is a minimum processing number and ICE may be able to exceed that number, including in months when the records it is processing do not require significant redaction.

2. CBP:  The parties' prior CMC statement reported that since the date of the parties' initial CMC, CBP continued the process of searching the records of the Office of Field Operations ("OFO") Taskings, OFO Program Analysis, and Evaluation ("PPAE"), Office of Intelligence ("OI"), Office of Information Technology ("OIT"), and United States Border Patrol ("USBP").  CBP identified approximately 49 pages of potentially responsive records from USBP, which it reported may change as any duplicates are removed, and also determined that OFO Taskings and OI did not have responsive records.  CBP determined that 42 of the 49 pages

of potentially responsive records from USBP were duplicates, and the remaining 7 pages must be withheld in full pursuant to Exemption 5.  With respect to determining a final page count of potentially responsive records, including any records held by OFO PPAE and OIT and any additional records held by USBP, CBP expected to be in a position to propose a schedule for the search, review and production of responsive records by the date of the parties' further CMC.

Since the date of the parties' prior CMC statement, Defendants reported to Plaintiffs that in addition to searching the records of OFO Taskings, OFO PPAE, OI, OIT, and USBP, CBP searched the records of the Office of Chief Counsel ("OCC"), National Targeting Center ("NTC"), and Acquisitions.  CBP also determined that OI may have potentially responsive documents.  CBP received 27 pages of documents from OI on August 31, 2021, and informed Plaintiffs that it would be able to process those pages and release non-exempt responsive material to Plaintiffs by October 16, 2021.  CBP completed its processing of these pages and released non-exempt responsive pages to Plaintiffs on September 16, 2021.  NTC completed its search for potentially responsive documents on August 31, 2021.  The remaining offices – OFO Taskings, OFO PPAE, OIT, OCC, and Acquisitions – confirmed they do not have responsive documents.  CBP has identified approximately 700 potentially responsive documents, and is currently working on de-duplicating these documents to obtain a relevant page count, which it expects to have by the date of the parties' CMC.

Separately, CBP has run email searches for records responsive to items 7 and 8 of the Request.  With respect to item 7, CBP finalized its list of custodians from the program offices on September 1, 2021, completed its search for responsive records on September 30, 2021.  With respect to item 8, CBP completed its search and uploaded the results on September 1, 2021.  CBP has identified approximately 120,000 emails relating to items 7 and 8, which are currently being reviewed for responsiveness and duplicates.  In response to Plaintiffs' inquiries, Defendants provided more detail about CBP's email searches for records responsive to items 7 and 8 of Plaintiffs' request.  With respect to item 7, CBP consulted with the program offices, finalized a list of 11 custodians, and ran a search using the key words "Clearview AI" and "Clearview" for the date range September 1, 2017 through August 31, 2021.  With respect to

item 8, CBP searched for emails to/from/cc the domain "clearview.ai" for the date range September 1, 2017 through August 31, 2021.

Defendants also addressed questions Plaintiffs raised about the number of duplicate pages CBP identified in its productions and CBP's approach to identifying duplicates. As noted above, like ICE, CBP considers identical documents to be duplicates, and has identified duplicates thus far by comparing documents side-by-side during the review. CBP identified 42 pages of duplicates in connection with its August 16, 2021 production (6 identical sets of a 7-page document from USBP that was withheld in full). CBP did not identify any duplicates in connection with its September 16, 2021 production.

3. <u>DHS</u>: In the parties' prior CMC statements, Defendants noted that DHS originally transferred the Request to ICE and CBP due to its subject matter. However, after the parties met and conferred on June 8, 2021, DHS investigated whether any of the following eleven offices may have responsive records: (1) the Office of Partnership and Engagement ("OPE"); (2) the Office of Operations Coordination and Planning ("OPS"); (3) the Office of the Executive Secretary ("ESEC"); (4) the Office of Biometric Identity Management ("OBIM"); (5) the Federal Protective Service ("FPS"); (6) the Science and Technology Directorate ("S&T"); (7) the Office of Intelligence and Analysis ("I&A"); (8) the Office of Strategy, Policy and Plans ("PLCY"); (9) the Federal Law Enforcement Training Centers ("FLETC"); (10) the DHS Privacy Office ("PRIV"); and (11) the Office for Civil Rights and Civil Liberties ("CRCL"). DHS thereafter determined that OPE, OPS, ESEC, FPS, PLCY, FLETC, OBIM, S&T, and I&A did not have responsive records, PRIV had 56 pages of potentially responsive records, and CRCL had 499 pages of potentially responsive records.

Defendants also reported to the Court that DHS had processed 250 pages of the 499 pages identified by CRCL and produced 153 pages to Plaintiffs on August 16, 2021. Of the remaining 97 pages, 22 pages were withheld in full pursuant to Exemptions 5, 6, or 7, 24 pages were referred to GAO, 45 pages were referred to PRIV, and 6 pages were duplicates. DHS calculated that it would be able to process the remaining 249 pages of records identified by CRCL and release non-exempt responsive records to Plaintiffs on September 16, 2021. DHS

reported that it would likewise endeavor to process the 56 pages identified by PRIV and release non-exempt responsive records to Plaintiffs by September 16, 2021.

Since the date of the parties' prior CMC statement, DHS completed its processing of the remaining 249 pages of records identified by CRCL and released non-exempt responsive records to Plaintiffs on September 16, 2021.  Of these 249 pages, DHS released 5 pages, referred 95 pages to ICE, referred 147 pages to CBP, and identified 2 duplicate pages.  PRIV processed the 56 pages it identified, 45 pages referred to PRIV by CRCL, and 6 pages referred to PRIV by ICE.  Of these pages, Defendants released 37 pages, sent 66 pages to OBIM for consultation, and determined that 4 pages were nonresponsive.

As Defendants shared with Plaintiffs, DHS also determined that OBIM located two potentially responsive documents (totaling 12 pages) that belong to other components of DHS, but which OBIM had in its possession.  Given the referral/consultation process with other agencies, Defendants expect to process these records and respond to Plaintiffs on November 16, 2021.

Defendants also confirmed that OBIM and DHS's remaining offices – OPE, OPS, ESEC, FPS, PLCY, and FLETC, OBIM, S&T, I&A – do not have responsive records.  In response to concerns Plaintiffs expressed about OBIM's negative determination, Defendants explained that OBIM's FOIA office consulted with three senior subject matter experts regarding Plaintiffs' request.  First, it consulted OBIM's Branch Chief, System Business Operations, Identity Operations Division, which serves as the IDENT/HART System Owner, Lead Business Authority, and Custodian of Records.  The Branch Chief oversees technical teams for the fulfillment of operational and organizational requirements, creates identity management tools and reports, enables manual biometric examination services, conducts stakeholder management, and provides biometric data system subject matter expertise to DHS and mission partners.  The Branch Chief confirmed that OBIM did not have any engagement with Clearview AI.  Second, OBIM's FOIA office consulted with the Division Director, Identity Capabilities Management Division, who oversees all policy, privacy, compliance, and acquisition management activities.  The Division Director searched her electronic files and email records using the search

term "Clearview" and located only the two potentially responsive records referenced above. Third, OBIM's FOIA office consulted with the OBIM Public Affairs Officer, who coordinates all public engagement, communications with external audiences, and handles specific requests for information. The Public Affairs Officer searched his electronic files and email records using the search term "Clearview" and located no responsive records. With respect to item 4 of Plaintiffs' request, the Public Affairs Officer confirmed he was not aware of any OBIM record listing approved facial recognition technology. In addition, the Public Affairs Officer verified with OBIM Procurement that OBIM did not have any procurement with Clearview AI. Accordingly, Defendants believe OBIM's determination followed searches that were reasonably calculated to uncover all relevant documents.

Finally, Defendants addressed questions Plaintiffs raised about the duplicate pages DHS identified in its productions. As noted above, like ICE and CBP, DHS only considers identical documents to be duplicates, and has identified duplicates thus far by comparing documents side-by-side during the review. DHS identified 6 pages of duplicates during its review for its August 16, 2021 production and 2 pages of duplicates in connection with its September 16, 2021 production. As noted above, Defendants do not believe they should be required to identify the Bates ranges of released pages that correspond to all sets of duplicates, especially given the lack of any legal obligation to identify duplicates in this manner, the absence of any de-duplication errors in this case, and Defendants' willingness to review documents in a manner that addresses Plaintiffs' prospective concerns about this issue.

///

///

Respectfully submitted,

DATED: October 13, 2021

/s/ *Vasudha Talla*
VASUDHA TALLA
American Civil Liberties Union Foundation of
    Northern California
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493
vtalla@aclunc.org

*Attorney for Plaintiffs*

STEPHANIE M. HINDS
Acting United States Attorney

/s/ *Savith Iyengar*
SAVITH IYENGAR
Assistant United States Attorney

*Attorneys for Defendants*

### ECF ATTESTATION

In accordance with Civil Local Rule 5(i)(3), I, Savith Iyengar, attest that I have obtained concurrence in the filing of this document from the other signatory listed above.

/s/ *Savith Iyengar*
SAVITH IYENGAR